# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA
        Plaintiff,

v.                                             Case No. 06-CR-118

JOHNNY L. RUFFIN
        Defendant.

## DECISION AND ORDER

The government charged defendant Johnny Ruffin with possessing a firearm as a felon, contrary to 18 U.S.C. § 922(g). Defendant moved to suppress the firearm, arguing that the arresting officer unlawfully patted him down. A magistrate judge held a hearing and recommended that I deny the motion. Defendant objected, and in addition to considering the parties' briefs, I held a supplemental hearing. I now grant the motion.

## I. FACTS

At about 12:09 a.m. on April 17, 2006, City of Milwaukee Police Officers Thomas Maglio and Jesse Egly received a radio report of an armed robbery at 2737 North Martin Luther King Drive. According to the radio report and information the officers subsequently received via the computer assisted dispatch ("CAD"), a man named Kenneth Gaston called the police to report the robbery, stating that a third party approached him on the street, said that a tavern had just been robbed, then ran southbound on Martin Luther King Drive. Gaston described the third party as a thirty-five year old black male with a light complexion and short Afro, wearing a yellow and black jacket.

The officers responded to the area of the robbery and spotted a man on a cell phone – later identified as Gaston – who flagged them down.  Gaston did not know what happened inside the tavern; he stated that someone came out, ran up to him and told him that an armed robbery had occurred, then ran away.  Egly asked for a description of the man, and Gaston described a black male with a light complexion and short Afro, about thirty-five years old, wearing a yellow and black jacket.  The officers proceeded to drive around the area looking for the man Gaston described.

While the officers drove around, Egly received additional information.  At about 12:12, the radio and the CAD reported that several subjects with a shotgun had robbed the tavern.  The report described one subject as wearing a red and black jacket and a second as wearing a blue jean suit.  At about 12:17, the radio and CAD reported additional descriptions. The report stated that one subject was a twenty-five year old, 5'8" black male armed with a shotgun and wearing a red and black jacket; the second was a twenty-five year old, 5'10" black male wearing a blue jean suit; and the third was a 5'10" black male wearing unknown clothing.

At about 12:34, while driving northbound on Martin Luther King Drive, the officers observed a man matching the description Gaston provided and slowly drove by him.  Egly testified that when the man saw the police van, he turned around and began walking southbound.  The officers turned around in an alley and stopped the man about a half-block from the location of the robbery.  They exited the van, and Egly told the man to show his hands, which he did.  The officers did not draw their weapons nor flash the lights on the van.

Egly approached and proceeded to check the man for weapons. He directed the man to turn around, placed his hands under the man's shoulders to keep his hands to the sides, pulled his shirt tight to see if there were any bulges, then glanced down and saw the handle of a gun in the man's right rear pants pocket. Prior to being pulled tight, the shirt obscured the back pocket. Egly testified that after commencing the pat-down, he asked the man if he had anything on him, and he believed that the man said he had a gun. (Tr. at 15.) However, Maglio's police report, to which Egly contributed, made no mention of Egly's question or of any response.

The man was later identified as the defendant, Johnny Ruffin. Egly described the location of the stop as a high crime area, in which he had made previous arrests for weapon and drug possession, prostitution and car theft. Egly stated that he believed defendant might be armed because he was involved in the robbery. Egly acknowledged that both Gaston and the CAD report stated only that defendant had witnessed and reported the robbery. However, he stated that he considered anyone running from the scene of a crime to be a suspect.

## II. DISCUSSION

The police may temporarily stop and detain a person in order to dispel a reasonable suspicion that the person has or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 10-11 (1968). In the present case, defendant does not contest the officers' decision to stop him. He had apparently witnessed a robbery, left the scene after advising Gaston of the crime, and quickly changed direction when the police observed him. Also, the incident occurred in a so-called high crime area. Cf. United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003) (stating that "a person's flight upon seeing the police approach in a high

3

crime area establishes reasonable suspicion to justify a Terry stop"). However, defendant does contest the legality of the subsequent pat-down.

Under Terry, an officer may conduct a non-invasive pat-down if he has reason to believe that the person he is dealing with is armed and dangerous. United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997). Propinquity to others suspected of criminal activity does not, without more, justify a pat-down. Id. (citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). Rather, "the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999). While the officer need not have probable cause to arrest, he must provide more than an inchoate suspicion or hunch. United States v. Sokolow, 490 U.S. 1, 7 (1989).

The standard is an objective one: "Would the facts available to the officer at the time of the seizure warrant a person of reasonable caution to believe that the action taken was appropriate?" United States v. Maher, 145 F.3d 907, 908 (7th Cir. 1998). In determining whether the officer had a reasonable basis to believe that the person was armed and dangerous, the court examines the totality of the circumstances known to the officer at the time, including the experience of the officer and the behavior and characteristics of the suspect. Lenoir, 318 F.3d at 729.

In the present case, when Egly patted defendant down, he knew that Gaston had said that a person who matched defendant's description had reported the armed robbery of a tavern and then ran away. Egly also received descriptions of the suspected robbers,

4

which did not match Gaston's description of defendant. Egly also observed that defendant walked in a different direction after seeing the police.[1]

The government argues that based on the foregoing knowledge Egly reasonably suspected that defendant was involved in the tavern robbery and thus was armed and potentially dangerous. The problem with this argument is that, by all accounts, defendant was a <u>witness</u> to the robbery rather than its perpetrator. Gaston was not inside the tavern and did not see the crime; he described defendant as the person who reported the robbery to him. Notwithstanding Gaston's statement, Egly testified that he believed defendant was involved in the crime. However, Egly's subjective beliefs are irrelevant; the question is whether it was reasonable for Egly to assume that defendant was armed. I conclude that it was not. Egly did not have a basis for reasonably suspecting that defendant was one of the robbers. It is extremely unlikely that a person who had just robbed a bar would immediately thereafter approach a stranger on the street and report the robbery. Further, Egly had received descriptions of the three robbers and none matched defendant.

The government also attempts to justify the pat-down on the ground that defendant ran away after reporting the robbery to Gaston; that he changed directions when he saw the police; and that he was in a high crime area. These factors may have justified the officers in stopping defendant to engage in further investigation, but the suspicion

---

[1]As noted above, Egly testified that he asked defendant if he had anything on him, and defendant may have admitted that he had a gun. However, Egly seemed uncertain about this and Maglio's report, which was prepared shortly after the incident and in which Egly had input, does not mention such a statement. Further, Egly testified that he had already commenced conducting the pat-down at the time defendant may have made the statement. Thus, the government has not shown that defendant admitted being armed, and even if he did, it was after Egly commenced the pat-down.

5

necessary to justify a Terry pat-down is different than that necessary to support a Terry stop. See United States v. Mattarolo, 209 F.3d 1153, 1157 (9th Cir. 2000) (stating that the court "must analyze the stop and the frisk separately and determine the reasonableness of each independently"); see also Illinois v. Wardlow, 528 U.S. 119, 124 n.2 (2000) (finding reasonable suspicion for stop when defendant fled in high crime area but expressing no opinion on the legality of the subsequent frisk); see also id. at 127 (Stevens, J., concurring in part and dissenting in part) (noting that Terry adopted different standards for stops and pat-downs). A stop requires suspicion that the suspect is involved in criminal activity, while a pat-down requires suspicion that the suspect is armed and dangerous. See Brown, 188 F.3d at 864 (stating that "the rationale of the pat-down is self-defense or defense of others"). The Supreme Court has made clear that "Terry did not adopt a brightline rule authorizing frisks for weapons in all confrontational encounters. Even in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." Maryland v. Buie, 494 U.S. 325, 334 n.2 (1990).

Egly relied solely on his belief that defendant was involved in the robbery; he pointed to no behavior causing him to believe that defendant was armed. Defendant followed all of Egly's instructions, made no furtive movements and did not resist in any way. Further, prior to patting him down, Egly observed no bulges in defendant's clothing suggestive of a weapon. Finally, Egly knew that the robbers possessed a shotgun, a weapon not easily concealed.

This leaves the fact that the stop occurred in a high-crime area. While this may be a factor in the Terry calculus, it cannot be the only factor. See Wardlow, 528 U.S. at 124

("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Were it otherwise, many law-abiding citizens who live in high crime areas would be subjected to routine invasions of their privacy not visited upon those fortunate enough to live in better parts of town. Therefore, under the totality of the circumstances, I find that the pat-down was not supported by reasonable suspicion.

The government relies on Lenoir, but that case is easily distinguishable. There, an officer observed the defendant walking down an alley only one-eighth of a block from a reported disturbance involving a man with a gun. The defendant fit the physical description broadcast to police, and the officer noticed that the defendant was carrying two high-powered weapons and appeared to be drunk. When he saw the police approaching, the defendant fled with the two weapons into a nearby home. 318 F.3d at 729-30. The court had little difficulty finding the officer justified in stopping the defendant under these circumstances. In the present case, defendant did not fit the description of any of the participants in the robbery, and Egly did not know defendant was armed until after conducting the pat-down.

The government also cites United States v. Wimbush, 337 F.3d 947 (7th Cir. 2003), but that case too is inapposite. In Wimbush, the officer responded to a radio dispatch of a shooting in an alley near Elm Street, which was allegedly committed by a black male driving a burgundy or maroon Ford Explorer with shiny rims. The officer set up surveillance and within about fifteen minutes saw the defendant, a black male, driving a purple Explorer with shiny rims. The officer pulled defendant over, learned that he did not have a driver's license, smelled marijuana and spotted an open bottle of alcohol in the console. After

7

asking the defendant to exit the vehicle, the officer asked where he was coming from, and the defendant replied, "From my cousin's house on Elm, I mean Avon." The officer then placed the defendant in his squad and searched the SUV, finding a gun. Id. at 948-49. The court found that because the defendant matched the description of the suspect in the shooting, the officer was allowed to stop him; because the defendant admitted coming from the location of the shooting, was driving without a license, and apparently possessed marijuana and an open container of alcohol, the officer was permitted to search the SUV. Id. at 950-51. In the present case, defendant did not match the description of the suspects in the armed robbery, he made no statement casting further suspicion on himself, and he committed no other crimes justifying an arrest and search.

Therefore, the government has failed to prove that Egly had reasonable suspicion to search defendant, and his motion to suppress must be granted.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (Docket # 6) is **GRANTED**.

Dated at Milwaukee, Wisconsin this 28th day of August, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge